IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTELLECT WIRELESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 1350 |
| | ) | |
| KYOCERA COMMUNICATIONS, INC., and | ) | |
| KYOCERA WIRELESS CORP., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On April 8 and April 19, 2010, this court held a claim construction hearing on the

disputed claim terms of U.S. Patent Nos. 7,266,186 ("'186 Patent") and 7,310,416 ("'416

Patent") pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). After

initially evaluating the evidence intrinsic to the patenting process, the court found that although

the intrinsic record provided some meaning that was helpful to the interpretation of the disputed

claim terms to a person of ordinary skill in the art, consideration of extrinsic evidence was called

for and appropriate in this case. Consequently, the court also has evaluated expert testimony

among other extrinsic evidence. Having considered all the evidence, both the intrinsic evidence

and the extrinsic evidence, along with counsels' arguments, the relevant legal authority, and the

parties' submissions, the court rules as stated below as to the meanings of the five disputed claim

terms to a person of ordinary skill in the art at the time of the application for the respective

patents at issue in this suit.

<u>BACKGROUND</u>

Plaintiff Intellect Wireless, Inc. ("Intellect Wireless") brought this suit against Motorola, Inc. ("Motorola"), LG Electronics, Inc. ("LG"), Sanyo North America Corporation ("Sanyo"), Kyocera Communications, Inc. (formerly known as Kyocera Sanyo Telecom, Inc.) ("Kyocera Communications"), and Kyocera Wireless Corp. ("Kyocera Wireless") for infringement of the '186 and '416 Patents and against Sprint Spectrum L.P. ("Sprint") for infringement of the '186 Patent and U.S. Patent Nos. 7,257,210 and 7,305,076. Motorola, LG, Sanyo, and Sprint have been dismissed from this dispute pursuant to settlements those defendants reached with Intellect Wireless. Intellect Wireless accuses Kyocera Communications and Kyocera Wireless (collectively "Kyocera"), the only remaining defendants, of infringing claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent and claims 1, 2, 4, 7, 25, 35, 36, 43, and 44 of the '416 Patent.

Intellect Wireless is the assignee of the '186 and '416 Patents, and Daniel A. Henderson is the named inventor. Both the '186 and '416 Patents share a common specification and claim priority to the 08/177,851 application, which was filed on January 5, 1994 and ultimately issued as U.S. Patent No. 6,278,862 ("'862 Patent"). The '186 Patent, which is titled "Method and Apparatus for Improved Personal Communication Devices and Systems,"[1] was filed on December 19, 2001, and issued on September 4, 2007; it is a continuation-in-part of the U.S. Patent No. 7,426,264 ("'264 Patent") which is a continuation-in-part of the '862 Patent. The

---

[1] In the April 8, 2008 Certificate of Correction, the title "Method and apparatus for improved paging receiver and system" was cancelled and replaced with "Method and apparatus for improved personal communication devices and systems." '186 Patent, Certificate of Correction.

'416 Patent, which is also titled "Method and Apparatus for Improved Personal Communication Devices and Systems," was filed on January 28, 2005, and issued on December 18, 2007; it is a division of the '186 Patent.[2]

Asserted claim 1 of the '186 Patent is an independent apparatus claim directed to a wireless portable communication device. '186 Patent, col.46 l.43. Asserted claims 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent depend on either claim 1 or on a claim or claims that depend on claim 1.

Claim 1 of the '186 Patent provides the following:

A wireless portable communication device for use by a message recipient for receiving a picture from a message originator having a telephone number, comprising:

a receiver operably coupled to receive a message from a message center over a wireless connection, the message including a non-facsimile picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator, the message originator sending the caller ID with the picture to the message center;

a display; and

a controller operably coupled to display the picture and caller ID on the display.

*Id.* at col.46 ll.43-56.

Claim 1 of the '416 Patent also claims an independent apparatus directed to a wireless portable communication device. '416 Patent, col.46 l.39. Asserted claims 2, 4, 7, 25, 35, and 36

---

[2] Because the '416 Patent is a continuation of the '186 Patent, the '416 Patent's specification is substantially identical to the '186 Patent. For convenience, most citations are to the '186 Patent's specification.

of the '416 Patent depend on either independent claim 1 or on a claim or claims that depend on

claim 1.

Claim 1 of the '416 Patent claims the following:

A wireless portable communication device comprising:

a CPU;

a portable receiver operably coupled to receive a message from a message center over a wireless connection, the message including a non-facsimile picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator, the message originator sending the caller ID with the picture to the message center, the portable receiver coupled to the CPU;

a memory that stores (1) Caller ID data received and (2) data associated with actual or potential communicants in a database, wherein the data represents at least one of:

a) a telephone number;
b) name;
c) address; and
d) picture information;

a small display coupled to and operable by the CPU that allows viewing data stored in memory that is associated with actual or potential communicants or received Caller ID data;

a connector; and

a detachable input interface that is releasably connected to the connector that is utilized to add or modify the stored data associated with actual or potential communicants.

*Id.* at col.46 ll.39-65.

Lastly, independent claim 43 of the '416 Patent claims the following "wireless portable

communication device":

A wireless portable communication device for use by a message recipient for receiving a picture from a message originator having a telephone number, comprising:

a receiver operably coupled to receive a message from a message center over a wireless connection, the message including a non-facsimile picture supplied by the message originator with a caller ID automatically provided by a communications network that identifies the telephone number of the message originator;

a memory that stores caller ID data received and a received picture;

a display for displaying the received picture and the received caller ID; and

a controller operably coupled to display data that is stored in memory.

*Id.* at col.50 ll.27-41. Asserted claim 44 depends on independent claim 43.

The parties have narrowed their claim construction disagreement to five claim terms for the court to construe: (1) "receiver," (2) "message center," (3) "caller ID," (4) "automatically provided by a communications network," and (5) "message originator sending the caller ID with the picture to the message center." Both Intellect Wireless and Kyocera filed briefs and materials in support of their respective interpretations of the five disputed claim terms, and on April 8 and 19, 2010, the court held a hearing during which Kyocera presented the testimony of Dr. Harold Poor, an expert in wireless communications. Both sides' attorneys thereafter presented their oral arguments as to their respective positions   The court has carefully considered the matter as discussed below.

LEGAL STANDARDS

Claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing *Innova/Pure Water, Inc. v. Safari*

*Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  In construing a patent claim,

courts are to give claim terms their "ordinary and customary meaning," which is "the meaning

that the term would have to a person of ordinary skill in the art in question at the time of the

invention." *Id.* at 1312-13.  The ordinary and customary meaning of a term is determined in

light of the entire intrinsic evidence, e.g., the claims, the specification, and the prosecution

history.  *Id.* at 1313.  In reviewing the specification to determine the meaning of claim terms,

however, "courts must take care not to import limitations into the claims from the specification."

*Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

<u>CLAIM CONSTRUCTION</u>

A.      Person of Ordinary Skill in the Art

        The parties agreed that for purposes of construing the disputed claim terms in the '186

and '416 Patents, a person of ordinary skill in the art at the time of the invention would have had

a Bachelor's Degree in electrical engineering and at least two years of experience in system

design work in the portable wireless communications field, a Master's Degree in electrical

engineering, and at least one year of experience in systems design work in the portable wireless

communications field or equivalent experience designing portable wireless systems or in the

electronic engineering field.  (4/8/10 Tr. 6:6-7:22.)  Additionally, the parties stipulated that the

"time of the invention" for purposes of determining the plain and ordinary meaning of the

disputed claim terms is the mid-1990s.  (*Id.* at 5:5-6:4.)

B.      Construction of Disputed Claim Terms

**1. "receiver"**

The disputed claim term "receiver" appears in claims 1, 2, 4, 7, 25, 35, 36, 43, and 44 of the '416 Patent and claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent.  Kyocera seeks to have the court construe "receiver" as "circuitry for receiving RF transmissions operably coupled to a paging network."  (Dkt. No. 207 ("Kyocera Br.") at 6.)  Intellect Wireless, on the other hand, challenges the "operably coupled to a paging network" limitation in Kyocera's proffered definition.  Intellect Wireless contends that the "receiver" is simply a "circuit or device for receiving signals."  (Dkt. No. 212 ("Intellect Wireless Resp.") at 7.)  The dispute between the parties centers on whether the "receiver" in the asserted claims of the '186 and '416 Patents must include circuitry which enables it to communicate with a paging network.

In construing the disputed terms, the court first looks to the claim language.  *See Phillips*, 415 F.3d at 1312.  Here, the asserted claims in the '186 and '416 Patents do not expressly require that the "receiver" be coupled to or able to communicate with a paging network.  Claim 1 of the '186 Patent and claims 1 and 43 of the '416 Patent state that the "receiver" is "operably coupled to receive a message from a message center over a wireless connection."  '186 Patent, col.46 ll.46-47; '416 Patent, col.46 ll.41-42, col.50 ll.30-31.  Those claims additionally only identify "a communications network" wit hout expressly defining the type of network, i.e. paging or cellular.  '186 Patent, col.46 l.50; '416 Patent, col.46 l.45, col.50 l.34.

The doctrine of claim differentiation further supports Intellect Wireless's position that the claimed "receiver" is not necessarily operably coupled to a paging network.  Under that doctrine, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption

that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at

1315. Dependent claim 14 of the '186 Patent, for example, claims "[a] wireless portable

communication device according to claim 1, wherein the receiver comprises at least one of: a

page receiver; a cellular telephone receiver; a radio frequency receiver; and a personal digital

receiver." '186 Patent, col.47 ll.48-53. By stating that the "receiver" includes at least a "page

receiver," claim 14 indicates that the "receiver" in independent claim 1 is not required to include

a page receiver or, in other words, a receiver operably coupled to a paging network. If, as

Kyocera argues, the claimed "receiver" in independent claim 1 of the '186 Patent must be

operably coupled to a paging network, the inclusion of a "page receiver" in dependent claim 14

would be redundant.

Dependent claims 7 and 8 of the '416 Patent also undercut Kyocera's argument that the

claimed "receiver" in the asserted claims must be able to communicate with a paging network.

Dependent claim 7 states that "the communication network includes a cellular system and the

wireless portable communication device includes one of a cellular telephone device or a

two-way communication device." '416 Patent, col.47 ll.14-18. The communications network

which provides the caller ID in claim 1 of the '416 Patent presumably is broader than the

communications network in dependent claim 7. Dependent claim 7, therefore, indicates that the

communication network in independent claim 1 is not limited to a paging network, as Kyocera

contends, but could instead be a cellular communications system. As a result, the claimed

"receiver," which receives the message, need not be operably coupled to a paging network.

Additionally, dependent claim 8 of the '416 Patent claims "[a] wireless portable

communication device as in claim 1 where the communications network includes a paging

system and the wireless communication device is a pager." *Id.* at col.47 ll.19-21.  Again, because the communications network in the independent claim is presumed to be broader than in the dependant claim, requiring the communications network in claim 1 of the '416 Patent to include a paging system would render superfluous the language in dependent claim 8 specifying that "the communications network includes a paging system."  Accordingly, the language of the claims does not support the "operably coupled to a paging network" limitation in Kyocera's proposed definition.  *See Bradford Co. v. Conteyor N. Am, Inc.*, 603 F.3d 1262, 1271 (Fed. Cir. 2010) (relying on claim differentiation to determine that disputed claim term was "entitled to a broader scope than the district court allowed").

Nor do the specifications or the prosecution histories of the patents at issue support imposing Kyocera's "paging" limitation into the claims.  Admittedly, Kyocera is correct that the specifications are replete with references to "paging" and "pagers."  The Field of Invention, for example, explains that "[t]his invention relates in general to communications systems and in particular to wireless communications systems which include paging devices."  '186 Patent, col.1 ll.25-28.  Similarly, the specifications' Description of the Prior Art "is specifically related to stored voice paging receivers and paging systems."  *Id.* at col.1 ll.34-35.

Nevertheless, "[t]he claims, not specification embodiments, define the scope of patent protection."  *Kara Tech., Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). "Generally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction.'"  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d

831, 843 (Fed. Cir. 2010) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).[3]

In this case, the specifications do not support requiring the "receiver" to be operably coupled to a paging network. First, the Abstracts for the '186 and '416 Patents illustrate that the court's construction of "receiver" should not depart from the term's plain and ordinary meaning. *See Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) ("We have frequently looked to the abstract to determine the scope of the invention, and we are aware of no legal principle that would require us to disregard that potentially helpful source of intrinsic evidence as to the meaning of claims.") (citations omitted); *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1207-10 (Fed. Cir. 2008) (reviewing patent's abstract in determining that specification did not support the district court's claim construction). The '186 Patent's Abstract, for example, recognizes that "[t]he personal communication device can be a cellular telephone, PDA or pager." Similarly, the '416 Patent's Abstract states: "The wireless communication device may include a cellular or paging link and can receive Caller ID data originating from the public switched telephone network over a wireless communication system." Notably, the

---

[3] Although Kyocera's counsel relies upon the Federal Circuit's en banc opinion in *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010), to bolster its position that the "paging" limitation should be imported into the claims, the court is not persuaded that *Ariad* alters the specification's role in the claim construction analysis. To the contrary, in *Ariad*, the Federal Circuit merely reaffirmed the well-established requirement that "the specification must describe an invention understandable to th[e] skilled artisan and show that the inventor actually invented the invention claimed." *Id.* at 1351. Furthermore, to the extent that Kyocera relies on *Ariad* to suggest that the patents in suit are invalid for lack of enablement, that question is not currently before the court. By way of dicta, this court hereby suggests that the statutory requirements of enablement and validity appear satisfied.

Abstract for the '416 Patent does not require that the claimed "receiver" be able to communicate with a paging network but rather merely indicates that the "receiver" may have such a capability.

Regarding the remainder of the specifications, although Intellect Wireless directs the court to the various references to "cellular" throughout the patent, the court finds that the following discussion of the AT&T "EO" is persuasive support for Intellect Wireless's position that the claimed "receiver" is not necessarily coupled to paging network:

> Personal communication device 61 [sic] may be a receive-only device, such as a paging device, or a more sophisticated bi-directional communication device, such as a personal communication device or personal digital assistant, such as the personal digital assistant sold under the trademark "Macintosh Newton" by Apple Computer, or the product sold by AT&T under the trademark "EO."

'186 Patent, col.36 l.66-col.37 l.5. According to a February 1993 article titled "EO Personal Communicator" which is cited in the specifications, the AT&T "EO" is a personal communication device which "connects to the cellular or external telephone system." (Dkt. No. 233 at 3.) Noticeably absent from the 1993 article is any discussion of paging networks or a paging receiver (*see id.* at 2-3), and Kyocera has not presented any evidence that the AT&T "EO," without additional equipment, could communicate with a paging network. Thus, the court agrees with Intellect Wireless that the specifications' reference to the "EO" would have indicated to one of ordinary skill in the art in the mid-1990s that the "receiver" in the claimed personal communication device was not limited to those only possessing circuitry enabling communication with a paging network.

As additional support for its proposed construction, Kyocera emphasizes the specifications' discussion of various paging communication protocols such as "POCSAG," arguing that the absence of any cellular communication protocols would suggest to one of

ordinary skill in the art that the "receiver" must be able to communicate with a paging network. The specifications, however, recognize that such protocols "are not essential to the main concept of the embodiments." '186 Patent, col.36 ll.61-62. Furthermore, Kyocera's wireless communications expert, Dr. Harold Poor, admitted that one of ordinary skill in the art in the mid-1990s would have understood that cellular protocols applied to communications involving cellular phones even if the patent did not specifically identify such a cellular protocol. (4/8/10 Tr. 154:7-155:24.) The court, therefore, does not find that the absence of cellular protocols in the specifications would indicate to one of ordinary skill in the art that the claimed "receiver" must be operably coupled to a paging network.

Kyocera also relies on the '186 Patent's prosecution history to attempt to justify its proposed construction and directs the court to the inventor's Rule 131 Declaration to the U.S. Patent & Trademark Office ("PTO") as well as to a letter attached to that declaration. The prosecution history, like the specification, "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The Federal Circuit, however, has "consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope." *Id.* at 1325. In this case, the court finds that the excerpts from the prosecution history are too vague and ambiguous to be held to disavow embodiments that are not operably coupled to a paging network.

Specifically, in the Rule 131 declaration cited by Kyocera, the inventor attempted to convince the examiner that the invention disclosed in the '186 Patent was conceived before February 10, 1993–the filing date for U.S. Patent No. 5,452,356 ("'356 Patent") which the examiner had cited against the '186 Patent's claims. As support for his asserted date of conception, the inventor stated:

> 5.     . . . Applicant conceived the subject invention prior to February 10, 1993, as evidenced by a block diagram and flow chart indicating the wireless transmission of an image and caller ID to a wireless portable communications device.
>
> 6.     That this block diagram describes a pageable device, namely the paging receiver, in which an image and the caller's telephone number are transmitted over a paging network.
>
> 7.     That this caller identification information is transmitted along with the image to the paging network, which caller identification information is then transmitted through the paging network to the portable communication device.

(Joint Appendix ("J.A") at 186FH000997.)

"An argument to the examiner constitutes a disclaimer only if it is 'clear and unmistakable.'" *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (quoting *Purdue Pharma L.P. v. Endo Pharms, Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)). In this case, although the inventor explains that the diagram demonstrating the date of conception includes a "paging receiver" and "paging network," those comments do not clearly and unmistakably limit the invention to paging communications. "In evaluating whether a patentee has disavowed claim scope, context matters." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). Here, the inventor was not distinguishing his invention from the prior art to avoid rejections based on either anticipation under 35 U.S.C. § 102 or obviousness under 35 U.S.C. § 103. The inventor was merely illustrating that his invention was conceived

prior to the filing date of the '356 Patent. In fact, the '356 Patent relates to paging communications; it is titled "Paging Transmission System" and, according to its Abstract, discloses a "[m]ethod and apparatus for sending, receiving, and displaying custom coded textual and/or graphic data via an alphanumeric paging system." Thus, when viewed in the appropriate context, the inventor's references to "paging" in the Rule 131 Declaration can be interpreted as describing one embodiment of the invention which was relevant to the cited '356 Patent. This interpretation is further supported by the inventor's more general description of his invention as related to the "wireless transmission of an image and caller ID to a wireless portable communications device." (J.A. at 186FH000997 ¶ 5.) Therefore, the court does not find that the inventor's statements in his Rule 131 Declaration constitute a disclaimer supporting Kyocera's "paging" limitation.

The court similarly disagrees with Kyocera that the inventor's October 1, 1993 letter to Sho Saito of Shinwa Communications of America Inc. ("Shinwa"), which he attached to the Rule 131 Declaration, warrants requiring the "receiver" to be operably coupled to a paging network. In that letter, the inventor described his invention as follows: "Thank you for taking an interest in me and my new invention related to intelligent numeric paging devices and systems. . . . My vision is to change the way in which pagers are used in the future and improve the information that is available to the end-user." (J.A. at 186FH001098.) Like the Rule 131 Declaration, the court is not persuaded that the inventor's description of one embodiment of his invention to a potential licensee supports imposing limitations on the claimed "receiver" that are not found in either the specifications or the asserted claims of the patents in suit.

Nor does the testimony of Kyocera's expert, Dr. Harold Poor, compel a different result. As the Federal Circuit has explained, "[w]hile helpful," "extrinsic evidence such as expert testimony is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Kara Tech., Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1317). In this case, the court finds that Dr. Poor's testimony does not overcome the intrinsic record's support for Intellect Wireless's proposed claim construction.

Dr. Poor testified that in his opinion, one of ordinary skill in the art in the mid-1990s would have found that the claimed "receiver" must have the capability of receiving and understanding transmissions from a paging network and have the ability to turn those transmissions "into useful information"; in other words, the "receiver" must be "operably coupled to a paging network." (4/8/10 Tr. 102:13-19; 103:25-104:8.) As one of the reasons supporting his position that the patents at issue involve paging as opposed to cellular networks, Dr. Poor contrasted how each network operated in transmitting communications between users. Paging networks, according to Dr. Poor, were "store and forward networks" where "[t]he person wanting to page another person would leave a message at a center, which would then be stored and then forwarded on to that person." (*Id.* at 86:12-16.) Cellular networks, on the other hand, "were designed for . . . realtime communication between two people talking on the phone." (*Id.* at 86:17-21.) Thus, Dr. Poor opined, because the patents at issue relate to this store and forward type of communication, they involve paging networks.

The evidence in the intrinsic record, however, suggests that other types of networks in addition to paging networks performed this store and forward service. According to the article

discussed above about the AT&T "EO," that device provided "store and forward fax services" where the "[n]ext time a [user is] in range of the cellphone system or . . . plug[s] into a wall socket, all [his or her] messages are transferred to [the user]."  (Dkt. No. 233 at 2.)  Again, that article makes no reference to "paging" or a "paging network," and Kyocera has not presented any evidence that the "EO," without the assistance of any additional equipment, was capable of connecting to a paging network.  The intrinsic evidence, therefore, contradicts Dr. Poor's distinction between paging and cellular networks, instead suggesting that store and forward messaging was available on devices that did not connect to paging networks.  Hence, as evidenced by the AT&T "EO" article, the presence of store and forward technology does not inherently require the involvement of a paging network.  Accordingly, the court, with all due respect to Dr. Poor's expertise, has not relied on or credited Dr. Poor's testimony on this point because the court finds that his opinions cannot overcome the plain language of the asserted patents' claims or specifications.

After carefully reviewing the '186 and '416 Patents, including their claims, specifications, and prosecution history, and considering Dr. Poor's testimony, the court finds that a person of ordinary skill in the art would not have understood that the claimed "receiver" must be "operably coupled to a paging network," as argued by Kyocera.  Instead, the court adopts Intellect Wireless's construction which captures the plain and ordinary meaning of "receiver": "circuit or device for receiving signals."

### 2. "message center"

The disputed claim term "message center" appears in claims 1, 2, 4, 7, 25, 35, 36, 43, and

44 of the '416 Patent and claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent.

According to Kyocera the "message center" is

> a conventional telephone answering device, a personal computer with voice/fax
> mail or modem communications, or a conventional facsimile device, or some other
> device suitable for receiving incoming calls automatically and initiating automatic
> outgoing calls automatically to a paging center or transmissions by an integrated
> paging transmitter in response to calls received.

(Kyocera Br. 17.)  Intellect Wireless, however, argues that "a computer, server, or other device

suitable for receiving and transmitting messages" is the proper construction of the claim term

"message center."  (Intellect Wireless Resp. 12.)  Again, the parties' primary dispute centers

around whether the "message center" includes similar "paging" limitations like those previously

discussed in connection with the "receiver" claim term.  Related to this dispute, the parties also

disagree as to whether the term "message center" was ambiguous to one of ordinary skill in the

art at the time of the invention in the mid-1990s.  Arguing that the term was ambiguous, Kyocera

bases its construction on a description of a message center from the specifications which refers

to paging.  Lastly, the parties contest whether the court's construction of "message center"

should explicitly acknowledge that the message center may be a server.  For the reasons

explained below, the court adopt's Intellect Wireless's proposed construction of "message

center."

     a.  "Message Center" Was Not Ambiguous to One of Ordinary Skill in the Art

     Relying on Dr. Poor's testimony, Kyocera argues that "[a]t the time of the invention, the

claim term 'message center' did not have a clear meaning to persons of skill in the art of wireless

communication systems that include paging devices."  (Kyocera Br. 18.)  Based on this

testimony, Kyocera argues that the court should adopt the following description of a "[m]essage

center device" from the specifications, which, according to Kyocera, "approaches an express definitional statement" of "message center" (*id.*):

> Message center device (301) may be a conventional telephone answering device, a personal computer with voice/fax mail or modem communications, or a conventional facsimile device, or some other device suitable for receiving incoming calls automatically and initiating automatic outgoing calls automatically to a paging center in response to calls received.

'186 Patent, col.5 l.65-col.6 l.4. Kyocera further argues that the additional inclusion of the "transmissions by an integrated paging transmitter" limitation in its proposed construction is supported by the specifications' recognition that the "message center" alternatively may integrate a paging transmitter. (*See* Kyocera Br. 19 (citing '186 Patent, col.9 ll.49-52; col.12 ll.32-37; col.16 ll.10-12, 47-51).)

Having reviewed the patents and a number of the cited references, the court is not persuaded that "message center" did not have a plain and ordinary meaning to one of ordinary skill in the art at the time of the invention. First, as discussed above in connection with the court's construction of "receiver," the court disagrees with Kyocera that the claimed invention is limited to "wireless communication devices that include paging devices." The appropriate inquiry, therefore, is whether the term "message center" was ambiguous to one of ordinary skill in the art of wireless communication devices.

Second, the intrinsic evidence suggests that "message center" would not have been ambiguous to one of ordinary skill in the art in the mid-1990s. The References Cited section in the specifications lists several telecommunications patents which consistently discuss "message centers" as receiving and transmitting messages. For example, U.S. Patent No. 5,007,076 ("'076 patent"), titled "Call Announcement Arrangement," was filed on November 3, 1989, and

discusses "transmitting call information . . . to a message center."  '076 Patent, col.16 ll.53-58.

Similarly, U.S. Patent No. 5,588,037 ("'037 patent"), titled "Remote Access Telephone Control

System," was filed on July 8, 1994, and addresses leaving a message at the call receiver's

"message center."  '037 Patent, col.7 ll.13-47.  Finally, U.S. Patent No. 5,950,123 ("'123

Patent"), titled "Cellular Telephone Network Support of Audible Information Delivery to

Visually Impaired Subscribers," was filed on August 26, 1996, and describes a "message center"

which is "connected to the fixed telephone network 20 and to the cellular telephone network"

and "functions as a store and forward center for receiving and delivering short message service

messages."  '123 Patent, col.3 ll.1-6.

This understanding of "message center" also comports with the claims' and the

specifications' repeated references to the message center as receiving and transmitting messages.

As described in the specifications, the invention relates to "[t]he automatic transmission of caller

id or ANI data from the PSTN to a message center, for storage and retransmission."  '186 Patent,

col.4 l.66-col.5 l.1.[4]  Similarly, the asserted claims describe a message being sent to the

"message center" which then transmits that message to the claimed "receiver."  Thus, the court

finds that the intrinsic record indicates that "message center" would have had a plain and

customary meaning to one of ordinary skill in the art at the time of the invention and that the

plain and customary meaning is consistent with Intellect Wireless's proposed construction.

---

[4]  "ANI" refers to "automatic number identification," and "PSTN" refers to "public switched
telephone network."  (*See* Kyocera Br. 20 nn.16-17 (citing Nat'l Commc'ns Sys.,
*Telecommunications: Glossary of Telecommunications Terms* (1996), *available at*
http://www.its.bldrdoc.gov/fs-1037/).)

b.  "Message Center" Is Not Limited to Paging Communications

Kyocera's arguments for a narrower construction of "message center" are not persuasive. Kyocera contends that the "message center," like the "receiver," has a "paging" limitation which requires the "message center" to "initiat[e] automatic outgoing calls automatically to a paging center" or "transmissions by an integrated paging transmitter."  However, as discussed more thoroughly above with respect to the claim term "receiver," the intrinsic evidence supports Intellect Wireless's position that the "receiver" need not be operably coupled to a paging network.  Because the "receiver" "is operably coupled to receive a message from the message center," the "message center" similarly is not constrained by Kyocera's proposed "paging" limitation.  Moreover, the plain language of the asserted claims simply requires that the "receiver" be capable of receiving a message from a "message center"; the claims do not mandate that the "message center" further be able to "initiat[e] automatic outgoing calls automatically to a paging center" or "transmissions by an integrated paging transmitter," as necessitated by Kyocera's proposed construction.[5]

Kyocera's reliance on the specifications for the '186 and '416 Patents as support for its construction also is misplaced.  According to Kyocera, the excerpt from the specifications which is the primary basis for its construction "approaches an express definitional statement" of "message center."  (Kyocera Br. 18.)  The court disagrees.  Although "[a] patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and

_____

[5]  To the extent that Kyocera relies upon the prosecution history to support its "paging" limitation in its proposed construction of "message center," the court rejects those arguments for the same reasons it declined to rely on the prosecution history to impose the "paging" limitation in its construction of the disputed claim term "receiver."

customary meaning," *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008), the Federal Circuit has repeatedly cautioned that "a patentee must clearly express that intent in the written description," *id.*  In this case, the excerpt from the specifications cited by Kyocera is not an explicit definition but rather uses permissive language: "Message center device (301) *may* be a . . . device suitable for receiving incoming calls automatically and initiating automatic outgoing calls to a paging center in response to calls received."  '186 Patent, col.5 l.65-col.6 l.4 (emphasis added).  "May" is a permissive term suggesting that the claimed "message center" is not constrained by this description.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010) (finding that "permissive language" in specification did not limit the disputed claim term).

Furthermore, contrary to Kyocera's proposed construction which includes the "paging" limitation, Figures 9A and 9B in the specifications disclose message centers which are not connected to paging networks.  In Figure 9A, the message center is directly connected to two personal communicators, and in Figure 9B, the message center is coupled to a telephone office and a personal communicator; neither of these figures identifies a "paging center" or a "paging network."  The court, therefore, finds that the specifications do not require the "message center" to initiate either outgoing calls to a paging center or transmissions by an integrated paging transmitter.

c.  "Message Center" Can Be a Server or Other Similar Device

Regarding Kyocera's contention that the "message center" is a "conventional telephone answering device, a personal computer, or a conventional facsimile device, or some other device," the court agrees with Intellect Wireless that this proposed language improperly imports

limitations from the specifications into the claims and implies that the "message center" is confined to an embodiment where it is located at the called party's location. As depicted in Figure 2b, however, the specifications disclose "an alternative embodiment in which a personal message center is located at the telephone office (102) rather than at the called party office (300)." '186 Patent, col.5 ll.36-38. Based on this embodiment, the court believes that one of ordinary skill in the art would have understood that the "message center" was not limited to devices typically used at an individual's home or office, such as a fax machine or personal computer, but also could have been a more high-powered device with greater storage capacity, such as a server.

Accordingly, the court adopts Intellect Wireless's proposed construction of "message center": "a computer, server, or other device suitable for receiving and transmitting messages," which is consistent with both the term's plain and ordinary meaning and the intrinsic evidence.

### 3. "Caller ID"

The disputed claim term "caller ID" appears in claims 1, 2, 4, 7, 25, 35, 36, 43, and 44 of the '416 Patent and claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent. Kyocera proposes the following construction of "caller ID":

> Conventional number and number/name caller id, ANI, video caller identifying data, fax header caller identifying data or alternate manually entered caller identifying data, where "conventional number and name/number caller id" is transmitted in the conventional manner between the ringing signals from the terminating central office. "Caller ID" does not include a unique identifier associated with a wireless portable communication device.

(Kyocera Br. 19.) Intellect Wireless, however, argues that Kyocera's proposed construction is unnecessarily narrow and improperly limited to a preferred embodiment. Instead, according to Intellect Wireless, the plain and ordinary meaning of "caller ID" is "data which identifies a

telephone number associated with the device of the message originator." (Intellect Wireless Resp. 16.) The conflicts in the parties' constructions center around three primary disputes. First, Kyocera believes that the inventor provided an "express definitional statement" of "caller ID" in the specifications, which Intellect Wireless disputes. Second, Kyocera argues that "[a] 'unique identifier' pertains explicitly to a device, whereas 'caller ID' refers to the telephone number of a person" (Dkt. No. 216 ("Kyocera Reply") at 13); Intellect Wireless, in contrast, disagrees that the "caller ID" cannot be associated with the message originator's device. Finally, Intellect Wireless challenges Kyocera's position that the "caller ID" must be transmitted in the "conventional manner."

a.      Inventor Did Not Expressly Define "Caller ID"

Kyocera predominately bases its definition of the term "caller ID" on the following description of caller ID in the specifications' "ANI Detector Used in a Paging Center" embodiment:

> Hereinafter, the generic term caller id shall be used interchangeably to describe conventional number and number/name caller id, ANI, video, fax header or alternate manually entered caller identifying data.

'186 Patent, col.8 ll.28-31. According to Kyocera, this language is an "express definitional statement" indicating that the inventor acted as his own lexicographer in defining "caller ID." (Kyocera Br. 20.) As explained above, however, although "[a] patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning[,] . . . [it] must clearly express that intent in the written description." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).

In this case, the court disagrees with Kyocera that the above-quoted excerpt from the specifications constitutes an express definition of caller ID. The asserted independent claims in the patents in suit recognize that the "caller ID . . . identifies the telephone number of the message originator." '186 Patent, col.46 ll.49-51; '416 Patent, col.46 ll.44-46, col.50 ll.33-35. Kyocera's construction, however, includes additional types of caller ID not contemplated by this claim language, such as "video" and "name caller id."

Additionally, the specifications present various descriptions of caller ID, thereby suggesting that Kyocera's purported definition is merely one of several illustrations rather than an express definition. In one embodiment, for example, the specifications refer to caller ID separately from ANI: "The stored voice communications device includes a means for receiving transmitted voice messages, receiver identifying control information, and source identifier information such as *caller id, ANI*, synthesized caller id, DTMF, image, or the like." '186 Patent, col.26 ll.13-15 (emphasis added). Notably, this excerpt appears *after* the inventor purportedly defined "caller ID." If, as Kyocera contends, the term "caller ID" already embraces ANI, the inventor would not have made this distinction between ANI and caller ID.

A more general definition of caller-identification information[6] also appears later in the patents' specifications:

> [C]onsidered broadly, caller-identification information may be solely data which
> identifies a telephone number associated with the telephone unit utilized to place
> a call, or the telephone number associated with the telephone unit utilized to place
> the call in combination with alphabetic characters identifying a name associated
> with that particular number in a telephone directory (i.e., a telephone directory

---

[6] The court notes that Kyocera does not appear to dispute that "caller-identification information" refers to "caller ID." (*See* Kyocera Reply 12.)

data base).  In either event, whether the directory name is provided or not, this
information can be considered to be the "caller-identification information."

*Id.* at col.35 l.66-col.36 l.8.  Consequently, the court does not agree with Kyocera's

position that the above-quoted excerpt from the specifications constitutes an "express

definitional statement" of "caller ID."

      b.      "Caller ID" Can Be Associated with the Message Originator's Device

The court similarly is unpersuaded by Kyocera's position that the "caller ID" is

associated only with the calling party, not that party's telephone device.  As quoted above, the

specifications instruct that "caller-identification information may be solely data which identifies

a telephone number associated with the telephone unit utilized to place a call."  *Id.* at col.35

l.66-col.36 l.2.  Additionally, according to the specifications, "[t]ypically Caller ID data

transmitted includes either 7 digit or 10 digit numeric data corresponding to the calling party's

telephone," *id.* at col.20 ll.28-30, and "[s]uch caller-identification information which may be

received includes numeric information corresponding to the telephone number of telephone 13

utilized by call originator 11," *id.* at col.37 ll.16-18.

The references cited in the specifications also indicate that the plain and ordinary

meaning of "caller ID" is "data which identifies a telephone number associated with the device

of the message originator," as proposed by Intellect Wireless.  Specifically, in an October 23,

1995 news release listed in the specifications' References Cited section, AT&T announced its

caller ID services for cellular customers in Washington state, explaining that caller ID

"display[s] the telephone numbers of incoming calls."  (Intellect Wireless Resp., Ex. L at

T020172.)  U.S. Patent No. 5,559,860 ("'860 Patent"), also identified in the References Cited

section, similarly discloses a "caller ID processor" and "caller ID memory" to store "identifying

data," which in one embodiment "is the telephone number of the calling party." '860 Patent, col.8 ll.1-5; *see also id.* at Abstract.

The prosecution history does not support a different construction. According to Kyocera, the inventor "surrendered" "a unique identifier associated with a wireless portable device" during the prosecution of the '186 Patent. (Kyocera Reply 13.) This surrender, Kyocera argues, demonstrates that "a 'unique identifier' pertains explicitly to a device, whereas 'caller ID' refers to the telephone number of a person." (*Id.*)

As discussed above, the doctrine of prosecution history disclaimer applies "where the patentee has unequivocally disavowed a certain meaning to obtain his patent." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). "For example, an amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010). In this case, the amendments to the claims identified by Kyocera do not "clearly narrow[] the scope of the claim" to constitute a disavowal of claim scope.

As support for its prosecution history disclaimer argument, Kyocera directs the court to a 35 U.S.C. § 102 anticipation rejection by the examiner in October 2006 and the inventor's subsequent amendments to the claims. In the rejection, the examiner stated:

> Regarding claim 33, Metroka discloses a wireless communication device (see Figure 1) comprising:
>
> a receiver . . . operably coupled to receive, over a wireless communication connection . . . call data including a message . . . and a unique identifier associated with the wireless portable communication device, the message

including visual image data, the call data optionally including associated caller identification information . . . .

(J.A. at 186H000874.)  The inventor made several amendments in response to this rejection, including deleting the phrase "unique identifier associated with the wireless portable communication device" and adding "caller ID automatically provided by a communications network that identifies the telephone number of the message originator."  (*Id.* at 186FH000974.)

As Intellect Wireless correctly notes, whether the rejection was premised on the "'unique identifier' limitation or some other element or combination of elements" is not apparent from the examiner's comments in the October 2006 office action.  (*See* Intellect Wireless Resp. 18.) Furthermore, the phrase "caller ID automatically provided by a communications network that identifies the telephone number of the message originator," which was added in the amendment, does not unambiguously disavow the association of the "caller ID" with the message originator's device and therefore does not clearly exclude "a unique identifier associated with the message originator's device" from the claim scope.  To the contrary, as discussed below, the court finds that "automatically provided" refers to the transmission of the "caller ID" without entry by the message originator.  For this transmission to occur, the "caller ID" presumably would be associated with the message originator's device. Thus, when viewed in the context of the entire amendment, the court finds that the patentee did not expressly disavow an embodiment of "caller ID" which is a "unique identifier associated with the wireless portable communication device."

The prosecution history for the parent '264 Patent, also relied upon by Kyocera, is similarly ambiguous.  In the September 2006 office action cited by Kyocera, the examiner rejected then-pending claim 192 of the '264 Patent's application as obvious under 35 U.S.C. § 103 offering limited explanation:

Regarding claim 192, Baehr discloses a method of communicating information from a calling party connected to a telephone network, to a called party having a portable communication device that is pageable by a paging system in communication with a message center, such message center in communication with the telephone network, comprising the steps of:

receiving at the message center caller identification information, pertinent to the telephone of the calling party;

transmitting the caller identification information from the message center to the paging system; and

transmitting the caller identification information from the paging system to the portable communication device . . . .

(Kyocera Br., App. Vol. 10 at KA00803-804.)

In response to that rejection, the inventor amended the entire claim, including deleting the phrase "receiving at the message center caller identification information pertinent to the telephone of the calling party" and replacing it with "receiving at the message center . . . message originator identification information provided automatically by the communications network as a caller ID identifying the telephone number of the message originator." (*Id.*, App. Vol. 10 at KA00786-787.) Again, like the excerpts from the prosecution history of the '186 Patent discussed above, the addition of the phrase "receiving at the message center . . . message originator caller identification information provided automatically by the communications network as caller ID identifying the telephone number of the message originator" does not clearly disavow unique identifiers associated with a device. The court, therefore, will not exclude "a unique identifier associated with a wireless portable communication device" from its construction of "caller ID."

c.      "Caller ID" Need Not Be Obtained in the "Conventional Manner"

28

Kyocera also contends that the claimed "caller ID" must be transmitted in the "conventional manner," i.e., "between the ringing signals from the terminating central office." According to Kyocera, because the phrase "conventional number and number/name caller id" in the "express definitional statement" of "caller ID" is a "potentially ambiguous term," the court should look to the specifications' discussion of the conventional transmission of caller ID to clarify the ambiguity. (Kyocera Br. 20.) The court does not agree with Kyocera on this point.

First, the asserted claims contain no reference to the "conventional" transmission of caller ID. Instead, they merely state that the "caller ID" is "automatically provided by a communications network" and describe "the message originator sending the caller ID . . . to the message center." *See, e.g.,* '186 Patent, col.46 ll.43-56. Second, because the court does not find that the description of "caller ID" from the "ANI Detector Used in a Paging Center" embodiment constitutes an express definition of the term "caller ID," that description's reference to "conventional number and number/name caller id" does not warrant reading Kyocera's proposed "conventional manner" limitation into the claims. Finally, even assuming that Kyocera's proposal for the term "caller ID" was considered to be an express definition, that definition nevertheless does not support requiring the caller ID to be transmitted in the "conventional manner." If the specifications had expressly defined "caller ID," as Kyocera contends, these additional "clarifications" propounded by Kyocera presumably would be unnecessary. Moreover, based on the court's interpretation of the phrase "conventional number and number/name caller id," the court believes that one of ordinary skill in the art would have found that "conventional" does not refer to *how* the caller ID is transmitted but rather describes what type of information the caller ID contains–in this case, the caller's name and/or number. For

these reasons, the court declines to include Kyocera's "conventional manner" limitation in its construction of "caller ID."

The court accordingly finds that Intellect Wireless's definition of "caller ID" is consistent with the plain and ordinary meaning of the claim term as demonstrated by the intrinsic evidence. Consequently, "caller ID" is "data which identifies a telephone number associated with the device of the message originator."

### 4. "automatically provided by a communications network"

The disputed claim term "automatically provided by a communications network" appears in claims 1, 2, 4, 7, 25, 35, 36, 43, and 44 of the '416 Patent and claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent. According to Kyocera, "automatically provided by a communications network" should be construed to mean "supplied automatically by the communications network." (Kyocera Br. 24.) Intellect Wireless, in contrast, argues that the proper construction is "supplied by the wireless portable communication device and/or the telecommunications network without manual entry by the message originator." (Intellect Wireless Resp. 21.) According to Intellect Wireless, Kyocera's proposed construction improperly "require[s] that the caller ID information be derived solely from the communications network to the exclusion of any other device or component such as the wireless device itself." (*Id.*) Instead, "automatically provided by a communications network," Intellect Wireless contends, simply means that "the caller ID information is provided without human intervention" (*id.*); in other words, when composing a message, the message originator does not need to enter his or her own caller ID information.

Turning first to the claims, the court finds that the plain language of claim 1 of the '186 and '416 Patents supports Intellect Wireless's position that the phrase "automatically provided by a communications network" is describing the transmission of the "caller ID" (i.e., that it is "automatic") as opposed to imposing limitations on the caller ID's origin. Specifically, those claims describe "the message originator sending the caller ID with the picture to the message center." '186 Patent, col.46 ll.51-53; '416 Patent, col.46 ll.46-48. Because the claims expressly recognize that the "caller ID" originates from the "message originator," the court does not believe that one of ordinary skill in the art in the mid-1990s, reading the phrase "automatically provided by a communications network" in the context of all the claim language, would have understood the term as precluding the "caller ID" from emanating from the message originator's device. Rather, the court finds that a person of ordinary skill in the art in the mid-1990s would have interpreted "automatically provided" to mean that the "caller ID" is not manually entered by the message originator.

This interpretation also is consistent with the specifications. First, the Background of the Invention explains that manual entry of caller ID was a disadvantage of the prior art:

> One particular problem with conventional paging systems using message center devices is the requirement that a caller must manually enter their call back telephone number. . . . This can be cumbersome particularly if the calling party wishes to also leave a voice message or send some other message data such as a facsimile.

'186 Patent, col.2 ll.19-28. Disparaging the manual entry of caller ID in the prior art likely would suggest to one of ordinary skill in the art that the references to "automatically provided" in the asserted claims indicate that such entry by the message originator is not required. *See*

*Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1367 (Fed. Cir. 2010) (relying on "disparag[ing]" discussion of the prior art to interpret claim term).

The specifications also distinguish between caller-identification information and manually entered information. Although Kyocera interprets this distinction as excluding embodiments where the caller ID originates with the message originator's device, the court instead believes that the comparison between automatically transmitted "caller-identification information" or "caller ID" and manually entered "optional data" indicates that the caller ID in the asserted claims is transmitted without manual entry. For example, in discussing Figure 21, the specifications contrast "caller-identification information" that "is automatically transferred to the central office" with "optional data" that the "page-originating communicant enters." '186 Patent, col.42 ll.50-56. The specifications also recognize that "[t]he most common application of an embodiment requires that the page-originating communicant enter either numeric or alphanumeric data *which is identified with* the caller-identification information." *Id.* at col.43 ll.4-7 (emphasis added). In this embodiment, "[u]pon receipt by portable communication device 271, at least one of either the numeric caller-identification information, or the alphabetic caller-identification information, *or the optional data entered by the page-originating communicant* is compared to one or more data fields in a database . . . ." *Id.* at col.43 ll.7-12 (emphasis added). The manually entered data, therefore, is distinct from the "caller-identification information" or "caller ID."

Not only do the specifications support Intellect Wireless's position that the message originator does not manually enter the "caller ID" but they also disclose the automatic transmission of the "caller ID" originating with the message originator's device. In one

embodiment, "upon establishment of a voice circuit between the telephone unit utilized by the page-originating communicant and the paging center, the caller identification information, if any exists, is automatically transferred to the central office." *Id.* at col.42 ll.47-51. Similarly, the specifications explain that "[i]n accordance with current Bell standards, caller-identification information may be transmitted, automatically, *between call-originator 11 and call receiver 15*, through the telephone network 9." *Id.* at col.34 ll.15-18. (emphasis added). The court accordingly finds that the specifications for the patents in suit support Intellect Wireless's assertion that the phrase "automatically provided by a communications network" simply indicates that the "caller ID" does not require manual entry by the message originator; it does not impose a limitation on the origin of the "caller ID."

The specification for the parent '862 Patent also bolsters Intellect Wireless's position. The court finds that the '862 Patent is relevant intrinsic evidence that one of ordinary skill in the art in the mid-1990s would have reviewed to understand the inventions claimed in the '186 and '416 Patents. *See Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) (recognizing that construction of claim term in parent patent "is relevant to an understanding of" how "that term is used in the [child patent]"). Specifically, the '862 Patent touts the impact of the automatic transmission of the caller ID on "enhancing the efficiency and accuracy of alphanumeric paging networks":

> It is another objective of the present invention to provide a method and apparatus for enhancing and improving the communication of information over an alphanumeric paging network, *which automatically sends caller identification information, including numeric information and alphabetic information, over the telephone network during interactions between a page-originating communicant and the paging network*, thus enhancing the efficiency and accuracy of alphanumeric paging networks, by then automatically transmitting the caller

identification information over the wireless communication link between a central
office and a page-receiving communicant.

'862 Patent, col.1 l.65-col.2 l.9 (emphasis added). In addition, according to the '862 Patent, the

page-originating communicant's paging request initiates the automatic transmission of caller ID:

"The paging request [from the page-originating communicant] automatically transfers

caller-identification information . . . from the telephone network to the alphanumeric paging

network." *Id.* at col.2 ll.29-33.

Like the '186 Patent, the '862 Patent also distinguishes between the transmission of the

caller-identification information, which occurs automatically, and an "optional message," which

requires the page-originating communicant's "input":

> Communication is initiated between the page-originating communicant and the
> alphanumeric paging network over a telephone network. The caller-identification
> information is automatically passed from the telephone network to the paging
> network. The page-originating communicant is allowed an opportunity to input
> an optional message into the paging network.

*Id.* at col.2 ll.52-58.

Nor does the prosecution history support Kyocera's interpretation of "automatically

provided by a communications network." Kyocera relies on the inventor's January 25, 2007

Amendment during the prosecution of the '186 Patent. In that amendment, the inventor added

the following phrase which appears (with slight variation) in all of the asserted claims: "the

message including a picture supplied by the message originator and a caller ID automatically

provided by a communications network that identifies the telephone number of the message

originator." (J.A. at 186FH000974.) The phrase's "parallelism," Kyocera contends, "makes

clear that one category of information ('a picture') is supplied by the message originator, and

another category of information ('caller ID') is provided by the network." (Kyocera Br. 24.)

Again, as explained above, the court believes that this juxtaposition between caller ID and other data such as a picture supplied by the message originator is consistent with Intellect Wireless's assertion that "automatically provided by a communications network" simply indicates that the "caller ID" does not require manual entry by the message originator; the phrase does not exclude the original provision of the "caller ID" by the message originator's device.

Nevertheless, although the court agrees with Intellect Wireless's position that the "caller ID" may originate from the message originator's device and does not involve manual entry by the message originator, the court cannot accept Intellect Wireless's proposed construction for two reasons. First, under one possible interpretation, Intellect Wireless's construction eliminates the phrase "by a communications network" from the asserted claims, replacing it with "wireless portable communication device." Second, the use of the phrase "the wireless portable communication device" incorrectly suggests that the claimed "wireless portable communication device" which receives the message, as opposed to the message originator's device, is sending the "caller ID." For these reasons, the court instead construes "automatically provided by a communications network" to mean "supplied by either the telecommunications network or the telecommunications network via the message originator's device without manual entry by the message originator."

**5. "message originator sending the caller ID with the picture to the message center"**

The disputed claim term "message originator sending the caller ID with the picture to the message center" appears in claims 1, 2, 4, 7, 25, 35, and 36 of the '416 Patent and claims 1, 2, 4, 5, 8, 10, 13, 14, 17, 34, and 35 of the '186 Patent. As an initial matter, the court notes that it has already determined that the phrase "message originator sending the caller ID with the picture to

the message center" does not require that the message originator actually undertake the action of sending the message. Instead, as this court previously found,

> [t]he plain language of the claims indicates that direct infringement is limited to a communication device possessing the recited structure and capable of receiving a message from the message originator via the message center; infringement does not require that "the message originator [send] the caller ID with the picture to the message center."

(Dkt. No. 199, 10/8/09 Mem. Op. & Order 10.) The phrase "message originator sending the caller ID with the picture to the message center," therefore, although not directly describing a function of the claimed personal communication device, is akin to functional language explaining the type of message the personal communication device must be capable of receiving. *See Manual of Patent Examining Procedure* § 2173.05(g) (8th ed. 2001, rev. 2008) ("A functional limitation is an attempt to define something by what it does, rather than by what it is (e.g., as evidenced by its specific structure or specific ingredients)."). Having made that observation, the court now turns to the parties' respective claim construction arguments.

Kyocera argues that "message originator sending the caller ID with the picture to the message center" means that "the third party from whom the picture is received sending the caller ID together with the picture to the message center." Intellect Wireless, on the other hand, contends that the proper construction is "a message originator sending a picture to a message center, the picture being associated with the message originator's caller identification information."

According to Intellect Wireless, Kyocera's proposed construction is flawed for two reasons. First, it requires the message originator, as opposed to the cell phone and/or personal communication device, to send the caller ID and the picture to the message center, thereby

suggesting that the message originator must manually enter the caller ID. Second, Kyocera's

proposed construction could be interpreted to mean that "the picture must be sent simultaneously

with the caller identification information to the message center." (Intellect Wireless's Resp. 24.)

As explained below, the court agrees with Intellect Wireless but ultimately construes the claim

term with a slightly modified definition from Intellect Wireless's proposed construction.

      a.      Manual Entry by the Message Originator Is Not Required

As discussed more thoroughly above in the court's discussion of the "automatically

provided by a communications network" claim term, the court has determined that the message

originator does not manually enter the caller ID, but rather the caller ID data is "supplied by

either the telecommunications network or the telecommunications network via the message

originator's device without manual entry by the message originator." Because the court agrees

with Intellect Wireless that Kyocera's proposed construction is susceptible to an improper

interpretation that manual entry by the message originator is required, the court declines to adopt

it.

Intellect Wireless's proposed construction, however, is also problematic. To address its

concern that the claim language be inappropriately interpreted as requiring manual entry of the

caller ID by the message originator, Intellect Wireless eliminates the phrase "message originator

sending the caller ID," from the claims, instead replacing that language with "the picture being

associated with the message originator's caller identification information." Cognizant that it

should not rewrite the claims, *see Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200,

1215 (Fed. Cir. 2008), the court instead construes the first part of the disputed claim term,

"message originator sending the caller ID," to mean "message originator sending the caller ID,

without manual entry of the caller ID," which reiterates that in composing and sending the message, the message originator does not manually enter the caller ID.

b.  Simultaneous Transmission of the Caller ID and the Picture Is Not Required

Regarding Intellect Wireless's second contention that Kyocera's use of "together with" in its proposed construction improperly implies that the caller ID must be sent simultaneously with the picture, the court agrees with Intellect Wireless that such a temporal limitation is not supported by the intrinsic evidence.  Claim 1 in both the '186 and '416 Patents simply states: "the message originator sending the caller ID with the picture to the message center"; the court does not find that the use of "with" in this context imposes a limitation requiring that the "sending" of the caller ID and the picture occur simultaneously.  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1346 (Fed. Cir. 2008) (declining to "impos[e] a temporal constraint" in claim because use of the term "with" in specification did not "unequivocally preclude a different order of steps").

Nor do the specifications support such a limitation.  For example, as described in one embodiment, the caller-identification information is transferred separately from the additional "optional data" entered by the message originator:

> [T]he caller identification information, if any exists, is automatically transferred to the central office, where it is decoded and preferably utilized in accordance with the software block 255 in a recorded menu exchange, wherein the information is verified and/or corrected and/or supplemented.
>
> In software block 257, the page-originating communicant enters optional data.  This optional data may be numeric data, alphanumeric data, digitized speech, facsimile messages, or images.

'186 Patent, col.42 ll.49-58.  The court, therefore, disagrees with Kyocera's position that the caller ID is sent "together with" the picture.  Instead, the court finds that one of ordinary skill in

the art would have understood the claim phrase "message originator sending the caller ID with the picture to the message center" to mean "message originator sending the caller ID, without manual entry of the caller ID, and the picture to the message center."

CONCLUSION

For the reasons stated above, the court construes the five patent claim terms disputed by defendant Kyocera and plaintiff Intellect Wireless in this case to mean the following:

1.  The claim term "receiver" is construed to mean "circuit or device for receiving signals."

2.  The claim term "message center" is construed to mean "a computer, server, or other device suitable for receiving and transmitting messages."

3.  The claim term "caller ID" is construed to mean "data which identifies a telephone number associated with the device of the message originator."

4.  The claim term "automatically provided by a communications network" is construed to mean "supplied by either the telecommunications network or the telecommunications network via the message originator's device without manual entry by the message originator."

5.  The claim term "message originator sending the caller ID with the picture to the message center" is construed to mean "message originator sending the caller ID, without manual entry of the caller ID, and the picture to the message center."

ENTER:

_James F. Holderman_
_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date:    June 29, 2010